IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 39942

BREMER, LLC, an Idaho limited liability company, and KGG PARTNERSHIP,

    Plaintiffs-Appellants,

v.

EAST GREENACRES IRRIGATION DISTRICT,

    Defendant-Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Coeur d'Alene, September 2013

2013 Opinion No. 133

Filed: December 17, 2013

Stephen W. Kenyon, Clerk

Appeal from the District Court of the First Judicial District, State of Idaho, Kootenai County. Hon. Lansing L. Haynes, District Judge.

District court's grant of summary judgment, denial of motion to reconsider, and denial of motion to alter or amend affirmed.

Bistline Law, PLLC, Coeur d'Alene, for appellants. Arthur M. Bistline argued.

James, Vernon & Weeks, P.A., Coeur d'Alene, for respondent. Susan P. Weeks argued.

---

BURDICK, Chief Justice

Bremer, LLC and KGG Partnership (collectively "Bremer") appeal the Kootenai County district court's grant of summary judgment to East Greenacres Irrigation District ("EGID") and the district court's denial of several additional motions. This case arose after EGID looped its pressurized water system to a main water line extension that Bremer constructed to serve Bremer's subdivided land. Bremer claimed the extension was an illegal tax. The district court granted EGID summary judgment on the grounds that Bremer and EGID had an agreement under I.C. § 43-330A where Bremer was responsible for constructing water line improvements to serve their land. Bremer argues on appeal that the district court erred because there were genuine issues of material fact as to (1) whether the parties reached an agreement under I.C. § 43-330A and (2) whether EGID had authority to require Bremer to pay for the extension.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2008, Bremer extended a main water line on Hayden Avenue in order to serve land within McGuire Industrial Park. This land and the water line are within EGID. EGID operates a pressurized irrigation system that delivers irrigation and potable water to its members. Around two and a half years after Bremer built the extension, EGID extended the water line further to form a "loop" within EGID's water system.

McGuire Industrial Park is located in Post Falls, Idaho, on the southeast corner of the McGuire Road and Hayden Avenue intersection. In early 2008, the water line that served the Industrial Park ran north alongside McGuire Road. Near the intersection of McGuire Road and Hayden Avenue, the water line dead ended on Hayden Avenue at a parcel immediately west of Bremer's parcel. At that time, Bremer hoped to re-plat McGuire Industrial Park, but needed a "will serve" letter from EGID to get the required approval from the Panhandle Health District.

Bremer took several actions in March 2008 that related to the Hayden Avenue main water line and providing water service to a lot within McGuire Industrial Park that had frontage on both McGuire Road and Hayden Avenue. Initially Bremer's representative, Jim Nirk, verbally informed EGID that Bremer needed a connection to the water system for a foam materials building on that lot. Subsequently, EGID informed Bremer that it would only grant approval for a new connection after Bremer submitted engineered plans and obtained Department of Environmental Quality (DEQ) approval. Later that month Gary Bremer, the managing member of Bremer, LLC, met with EGID. EGID informed Bremer that the foam materials building needed the extension and hydrants with proper fire flow pressure.

After the meeting Bremer contacted their attorney, Brent Schlotthauer, about the perception that the main line extension was unrelated to their connection. Bremer thought EGID was requiring them to install this extension to receive water service. Based on that thought, Bremer believed EGID was coercing them to install the extension because the business would lose $6,000 a day without the water to operate. Schlotthauer then met with Ron Wilson, EGID's manager. Wilson told Schlotthauer that Bremer would not get water until they agreed to build the extension, citing EGID's by-laws as the legal authority. EGID's by-laws required that "[w]henever a landowner requests system additions or modifications, they shall be designed and constructed at the landowner's expense." EGID also had a policy that "[m]ainline extensions shall be required so as to provide for proper present or future circulation of water within the

2

system, as determined by the board of directors." Schlotthauer then advised Bremer that although the extension may be illegal, the costs to the business meant the "only logical course was to capitulate to the demand, and then institute suit after the fact."

In April 2008, Bremer recorded a re-plat of several lots within McGuire Industrial Park. This re-plat made Lot 1 smaller and gave Lot 2 an irregular L-shape with frontage on both McGuire Road and Hayden Avenue. Bremer got the required approval for this re-plat from the Panhandle Health District after EGID issued a "will serve" letter, stating that EGID had the capacity and intent to serve the Industrial Park and that a proposed main line extension would improve service. Bremer's engineer, Scott Jones, submitted plans to DEQ and EGID in May 2008 that proposed the Hayden Avenue main line extension. The next month DEQ disapproved the plan because Bremer needed to show that it met local fire flow requirements. DEQ granted approval later that month after the fire authority affirmed that the plan met those requirements.

Bremer then completed the extension. Jones submitted as-built project plans to EGID in September 2008. These plans showed that Bremer extended the main line along Hayden Avenue, adding two fire hydrants in the public right-of-way and a fire sprinkler line to the building. Bremer spent at least $48,340 on construction. After connection, DEQ approved the line.

About a year later, Bremer notified EGID that they were subdividing Lot 2 into Lots A and B, as well as proposing an improvement on Lot B. Lot A fronted McGuire Road and Lot B fronted Hayden Avenue. That re-plat was approved by Panhandle Health District based upon EGID's assurance in a "will serve" letter that the 2008 extension gave EGID the ability to serve the property. EGID later "looped the system" by connecting another main line to the Hayden Avenue extension. The general purpose of "looping" a system is to equalize pressure and provide increased flows. Thus, looping benefits all users and the entire water system. Bremer did not have to pay for "looping" the line.

Bremer filed their Complaint against EGID on March 4, 2011, alleging that Bremer's extension improvements were unrelated to Bremer's use of EGID's water system and thus an illegal tax. After EGID filed its Answer, Bremer filed a motion for summary judgment and supporting memorandum on November 16, 2011. The next day EGID filed its Motion for Summary Judgment, supporting memorandum, and affidavits from Ron Wilson and Jim Sappington. Wilson, EGID's manager, stated that a McGuire Road connection could not meet local fire flow requirements. EGID's Superintendent of Operations and Maintenance, Jim

Sappington, stated that the only way to connect Bremer's building was through the Hayden Avenue main line extension. Bremer later submitted Bob Skelton's affidavit, which stated that Bremer's fire suppression system did not require an extension from Hayden Avenue.

After hearing oral argument and considering supporting affidavits, the district court granted EGID's Motion for Summary Judgment. The district court concluded that no genuine issues of material fact existed that would allow a reasonable jury to find that Bremer's main line extension was unrelated to Bremer's use of the water system. Because the "Idaho legislature intended that irrigation districts have the power to require landowners who subdivide to pay for the costs extending the pressurized water system to the improved parcel," the district court found Bremer reached an agreement with EGID under I.C. § 43-330A. Thus, the court also held that the extension was not an illegal tax.

Bremer then filed a motion for reconsideration. Bremer argued that (1) EGID could only require subdividing landowners to pay for an extension when the parcel lacked infrastructure for the proper distribution of water and the improvements were directly related to the subdivision and (2) Wilson, Sappington, and Skelton's affidavits created a material question of fact on whether Bremer needed the extension. The district court denied the motion, finding that Bremer presented no new issues of fact or law.

Additionally, Bremer filed a Motion to Alter or Amend the Judgment and/or to Set Aside the Judgment and to Consider Additional Evidence with a memorandum and affidavits from Gary Bremer and Brent Schlotthauer. On April 27, 2012, the district court heard and denied the motion. Bremer timely filed an amended notice of appeal.

## II. ISSUES ON APPEAL

1. Whether the district court erred in granting summary judgment to EGID.
2. Whether the district court erred in denying Bremer's Motion to Alter or Amend Judgment.
3. Whether either party is entitled to attorney fees on appeal.

## III. ANALYSIS

**A. The district court properly granted summary judgment to EGID.**

The first issue is whether the district court correctly held there was no genuine issue of material fact as to whether Bremer entered into an agreement under I.C. § 43-330A. Bremer makes several arguments as to why the district court erred in granting EGID summary judgment

4

on this basis. Bremer first argues that there was no agreement because (1) nothing indicates that the parties complied with I.C. § 43-330A–G and (2) EGID coerced Bremer's consent. Second, Bremer contends that even if there was an agreement, that agreement was not proper because the main line extension was not a necessary improvement for proper water distribution. Third, Bremer argues that the district court incorrectly raised the voluntary payment rule because nothing in EGID's motion for summary judgment implicated that rule.

We review a district court's grant of summary judgment using the same standard the district court used in ruling on the motion. *Buckskin Props., Inc. v. Valley Cnty.*, 154 Idaho 486, 490, 300 P.3d 18, 22 (2013). Therefore, this Court affirms summary judgment when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). Under this standard "all reasonable inferences that can be drawn from the record are drawn in favor of the non-moving party." *Kootenai Cnty. v. Harriman-Sayler*, 154 Idaho 13, 16, 293 P.3d 637, 640 (2012).

Idaho irrigation districts are formed when a majority of the title holders to irrigable land approve an irrigation district under the requirements of Title 43 of the Idaho Code. I.C. § 43-101. After formation, each district also assumes certain powers. For example, an irrigation district's board of directors has the power to (1) conduct the district's business affairs and "make and execute all necessary contracts"; (2) establish by-laws "as may be necessary and just to secure the just and proper distribution of [water]"; (3) "locate the necessary irrigation works . . . on any lands which may be deemed best for such location"; and (4) "do any and every lawful act necessary to be done that sufficient water may be furnished to the lands in the district for irrigation purposes." I.C. § 43-304. The legislature has therefore provided irrigation districts many powers in order to provide water to their users.

There are two specific methods for individuals to extend an irrigation district's service to a parcel. The first method requires that a property owner petition an irrigation district's board of directors for construction of any necessary improvement to a water system. I.C. § 43-328–§ 43-330. If the board approves the petition, it then holds an election and assesses improvement costs to the benefited land. I.C. § 43-330. The second method, which is at issue here, involves only subdivided land. When owners of subdivided land propose development, "the board of directors

5

of the district may enter into a contract with the owner . . . for the construction of a pressurized system for the proper distribution of irrigation water to the parcel . . . ." I.C. § 43-330A.

### 1. The parties properly reached an agreement under I.C. § 43-330A.

The district court held that Bremer and EGID entered into an agreement under I.C. § 43-330A where Bremer would construct the Hayden Avenue main line extension to the subdivided parcel. Thus, the district court found no genuine issues of material fact as to whether (1) there was an agreement, and therefore a contract, and (2) whether that agreement could exist under I.C. § 43-330A even without following the statute's requirements.

#### a. *The parties reached an agreement.*

A contract requires mutual assent. *Gray v. Tri-Way Const. Servs., Inc.*, 147 Idaho 378, 384, 210 P.3d 63, 69 (2009). This requires "[a] distinct understanding common to both parties" to exist. *Id.* Therefore, mutual assent or a "meeting of the minds" must occur on every material term in the contract. *Barry v. Pac. W. Const., Inc.*, 140 Idaho 827, 831, 103 P.3d 440, 444 (2004).

Here, all of the evidence points to the existence of a contract between Bremer and EGID. The contract's material terms were that Bremer was responsible for constructing and paying for the extension improvements. Bremer brought their plans to EGID when Bremer's engineer, Scott Jones, submitted his plans that included the extension. Jones's plans continued through the approval process, and ultimately Bremer constructed the extension according to those plans.

While Bremer stated that they were coerced because their business would lose $6,000 a day due to an inability to operate without the extension, Bremer still constructed and paid for the extension. Prior to the construction, Bremer contacted their attorney, who negotiated but made no progress. However, negotiation is what often happens before two parties agree, and there is no other evidence that indicates Bremer provided EGID an alternative plan. Even if we considered the attorney's affidavit submitted in Bremer's Motion to Set Aside, Bremer's attorney advised them to continue. The attorney felt the requirement was illegal, but advised that the "logical course" was to build the extension anyway given the money invested and the time it would take to litigate. This is yet another indication that Bremer chose to build the extension. Thus, because Bremer submitted plans and built the extension, there is not any genuine issue of material fact as to whether Bremer agreed to construct the main line extension.

6

Bremer's action compares to those of the plaintiffs in *KMST, LLC v. Cnty. of Ada*, 138 Idaho 577, 67 P.3d 56 (2003). There, a developer sued a highway district for inverse condemnation, claiming that the district took the developer's property because it required that the developer build a public road. *Id*. at 578–80, 67 P.3d at 57–59. This occurred after the developer proposed the road to the highway district in hopes that doing so would help the district gain the county commissioners' approval for a subdivision. *Id*. After the commissioners granted approval, the developer completed the road and dedicated it to the highway district. *Id*. at 582, 67 P.3d at 61. This Court held that there was no taking because the developer "voluntarily decided to dedicate the road to the public in order to speed the approval of its development." *Id*. The voluntariness of the developer's proposal was the basis of this Court's decision, not the fact that the developer built the road before he challenged the requirement. *Id.* at 582, 67 P.3d at 61 n.1. Indeed, we emphasized that voluntariness when we specified that "*KMST itself proposed* that it would construct and dedicate the street as part of its development." *Id.* (emphasis added).

In another case where a developer claimed that a county's payment requirement was an unlawful fee, this Court noted the voluntariness of the developer's agreement and held there was no taking because the developer sent the county a proposed capital contribution agreement with its development application. *Buckskin Props., Inc. v. Valley Cnty.*, 154 Idaho 486, 494–96, 300 P.3d 18, 26–28 (2013). There, the developer proposed the included capital contribution agreement requiring the developer to pay "agreed-upon compensation" to the county to mitigate for the development's impact. *Id.* at 495, 300 P.3d at 27. Both parties later signed a similar capital contribution agreement. *Id.* at 492, 300 P.3d at 24. While the developer's engineer stated that this impact fee was included in the agreement because the county required it, the developer did not object to the agreement or the payment requirement to any representative of the county at any time. *Id.* at 495–96, 300 P.3d at 27–28. Thus, we reasoned that this developer's proposal and agreement without objection to the impact fee were voluntary and similar to the developer's actions in *KMST*. *See Id.* at 491–96, 300 P.3d at 22–28.

Here, Bremer's actions are similar to those of the developers in *KMST* and *Buckskin*. Similar to how the *KMST* developer took the initiative to propose the road to the highway district, Bremer approached EGID about water for their new building and had Bremer's own engineer submit his plans to EGID. Those plans included the main line extension. Analogous to the engineer in *Buckskin* who stated the fee was only included because the country required it,

Bremer's engineer said that EGID told him that it required the extension. After submitting the plan, Bremer decided to build the main line extension to allow their business to operate, similar to how the developer in *KMST* voluntarily completed a road to speed the city's approval of the development. Thus, *KMST* and *Buckskin* generally indicate that a person cannot propose an improvement and thus voluntarily agree to the improvement, and then later contend there was no agreement because the improvement was for the public.

Bremer argues that even if we use *KMST* for the proposition above, it does not apply here because EGID coerced Bremer through economic duress. Bremer points to Gary Bremer's affidavit that states he was coerced and the business would lose $6,000 a day. Bremer also cites *Green v. Byers*, 16 Idaho 178, 101 P. 79 (1909), for the rule that there is economic coercion when the denial of water results in a loss of the productive capacity of real property.

However, *Green* is distinguishable. There, we defined duress as "that condition of mind produced by the wrongful conduct of another, rendering a person incompetent to contract with the exercise of his free will power . . . ." *Id.* at 182, 101 P. at 80. In *Green*, the defendant alleged duress after an irrigation company refused to deliver water to him unless he signed a special contract. *Id.* at 183, 101 P. at 80–81. We held that the defendant was under duress and the company was bound to deliver the water because the defendant had done "all that the laws of the state require him to do in order to get that water . . . ." *Id*. at 183, 101 P. at 81. Indeed, the irrigation company could not legally require the defendant to sign a special contract because the law did not require a contract. *Id.* Conversely, here the law did allow Bremer to pay for the extension because the legislature authorized the irrigation district to enter into contracts under I.C. §43-330A. Nothing about what EGID did here was illegal. In fact, the contract was properly authorized by a statute. Thus, *Green* does not apply.

b. *The parties properly complied with I.C. § 43-330A–G.*

Bremer contends that even if there was a contract, the contract is void and unenforceable for failure to abide by I.C. § 43-330A–G. Contracts between an irrigation district and an owner of subdivided land under I.C. § 43-330A have several statutory requirements. For example, the contract must include certain mandatory provisions about apportioning the cost of the upgrades. I.C. § 43-330B. Also, the contract must be recorded under I.C. § 43-330D, which implies that the contract must also be written. Bremer argues that EGID did not comply with these requirements and thus the agreement is not binding. This argument fails.

8

First, Bremer's argument fails because I.C § 43-330D states that "the owner or owners named in the contract shall remain personally liable, jointly and severally, for the cost of construction until the contract has been properly recorded." *Id*. In other words, those that enter into a contract with an irrigation district remain liable even when a contract is not recorded. Therefore, Bremer was liable even without a recorded contract.

Second, the district court held that an oral contract could be binding because Bremer claimed an illegal tax and not contract damages. Indeed, the district court stated that lack of writing could be a material circumstance if Bremer's claim was for unpaid construction costs. However, because Bremer's claim was not for unpaid costs, there was no statute of frauds requirement that the contract be in writing. Thus, the lack of recording is not fatal to the district court's holding that Bremer and EGID had a contract.

Third, the district court held that the legislature intended that irrigation districts have the power to require subdividing landowners to pay for the costs of extending the pressurized water system. The statutory language supports this interpretation. Idaho Code section 43-330A permits irrigation districts to enter into contracts with the owners of subdivided land: "the board of directors of the district *may* enter into a contract with the owner . . . ." I.C. § 43-330A (emphasis added). Thus, an irrigation district can choose to contract. Additionally, I.C. § 43-330B protects the irrigation district and ensures a landowner will repay improvement costs by (1) including in the contract an apportionment of the system construction cost; (2) providing that the construction cost is a lien against the parcel; and (3) requiring the contract include an installment payment schedule for unpaid costs. *Id*. Because the legislature allowed irrigation districts to contract and protected districts from non-payment, the statute supports the district court's holding. Because of I.C. § 43-330D's language, the fact that the statute of frauds does not bar the contract, and the statute's nonpayment protections, we hold that the contract is enforceable under the plain language in I.C. § 43-330A–G.

2. The improvement must allow proper distribution of irrigation water to the parcel.

We have held that "when the language of a statute is definite, courts must give effect to that meaning whether or not the legislature anticipated the statute's result." *Viking Const., Inc. v. Hayden Lake Irr. Dist.*, 149 Idaho 187, 192, 233 P.3d 118, 123 (2010), *abrogated on other grounds by Verska v. Saint Alphonsus Reg'l Med. Ctr,* 151 Idaho 889, 265 P.3d 502 (2011). The Court will only construe a statute when its wording is ambiguous. *Id*. Bremer argues that the

extension is an illegal tax because no statutory authority exists to allow EGID to impose this improvement on Bremer. Bremer contends EGID did not have authority because the legislature never granted irrigation districts the power to require one landowner to pay for capital improvements that benefit the entire system. In concluding that this was a "capital improvement," Bremer relies on the inference that the main line extension was only intended as a system improvement.

Article VII, Section 6 of the Idaho Constitution allows the legislature to give municipal corporations the power to tax. A municipality's taxing power "is limited to that taxing power given to the municipality by the legislature." *Idaho Bldg. Contractors Ass'n v. City of Coeur d'Alene*, 126 Idaho 740, 742, 890 P.2d 326, 328 (1995). Bremer admits the legislature gave irrigation districts many options to raise revenue, but argues none of those apply here because the improvement was not "necessary." Bremer's reasoning comes from how he reads the statute's plain language.

Bremer adds the word "necessary" into I.C. § 43-330A by stating that "the improvements must be necessary for the proper distribution of water." However, the word necessary is absent from I.C. § 43-330A. The statute instead states that when subdividing landowners propose development "the board of directors of the district may enter into a contract with the owner . . . for the construction of a pressurized system for the proper distribution of irrigation water to the parcel . . . ." I.C. § 43-330A. This section never states that the improvement must be necessary. Instead, it only articulates that the construction must be "for the proper distribution of irrigation water to the parcel." *Id.*

Bremer asserts that I.C. § 43-331 gives the board the authority to determine whether improvements are "necessary" for the proper distribution of water. However, the word "necessary" also does not appear in I.C. § 43-331. Instead, that section allows a district to levy assessments for irrigation improvements on subdivided land when "the owner has made no provisions which in the opinion of the board of directors is *adequate* for the proper distribution of water thereto." I.C. § 43-331 (emphasis added). However, this section has limited applicability because Bremer was an owner that did make a provision for water under I.C. § 43-330A. Therefore, I.C. § 43-331 does not apply.

Finally, although I.C. § 43-330A does not require that the main line extension be a "necessary improvement," the extension was necessary because Bremer needed the extension to

10

get their re-plat approved. Panhandle Health District would not grant final approval of Bremer's re-plat until it received a "will-serve" letter from EGID. EGID noted that the main line extension would improve service, and issued a "will-serve" letter on the basis that Bremer's plan would meet regulations. Those regulations include local fire flow requirements. If Bremer had submitted a plan to EGID that would not meet fire flow requirements, then EGID's "will serve" letter would not be effective, and Bremer could not have gotten Panhandle Health District's approval. However, Bremer's engineer submitted the extension plans, which did meet fire flow requirements. Therefore, the extension was necessary to approve Bremer's re-plat because it allowed EGID to properly issue a "will-serve" letter.

3. The district court did not rely on the voluntary payment rule on summary judgment or the motion to reconsider. [1]

On summary judgment, the trial court examines the pleadings to determine what issues the movant raised and only considers issues raised by the pleadings. *Esser Elec. v. Lost River Ballistics Techs., Inc*., 145 Idaho 912, 919, 188 P.3d 854, 861 (2008). The trial court also uses the pleadings "to determine whether all or only some issues raised in the pleadings have been placed at issue by the motion for summary judgment." *Id.* Thus, the trial court will only decide issues raised in the moving party's motion for summary judgment. *Id.* As for motions to reconsider, we recently clarified that the standard of review was "the same standard of review used by the lower court in deciding the motion for reconsideration." *Fragnella v. Petrovich*, 153 Idaho 266, 276, 281 P.3d 103, 113 (2012). Thus, when the district court grants summary judgment and then denies a motion for reconsideration, "this Court must determine whether the evidence presented a genuine issue of material fact to defeat summary judgment." *Id*. This means the Court reviews the district court's denial of a motion for reconsideration de novo.

Bremer argues that the district court erred when it relied on the voluntary payment rule in granting EGID's motion for summary judgment because EGID never argued that Bremer voluntarily agreed to pay for the extension. The voluntary payment rule provides that "a person cannot, either by way of set-off or counterclaim, or by direct action, recover back money which he has voluntarily paid with full knowledge of all the facts, and without any fraud, duress or extortion, although no obligation to make such payment existed." *Breckenridge v. Johnston*, 62

---

[1] While Bremer's brief addresses the voluntary payment rule in the context of summary judgment, the primary place Bremer addressed the rule in the district court was in the Motion to Alter. However, Bremer implies that they only became aware that the district court relied on this rule in the court's ruling on the motion for reconsideration.

Idaho 121, 133, 108 P.2d 833, 838 (1940). Under this rule, a person cannot recover a payment that he voluntarily made to satisfy a demand in excess of what is legally due, if he made that payment with full knowledge of the facts and free from mistake, fraud, duress, or extortion. *Id.*

Here, Bremer's assertion that EGID did not raise the voluntary payment rule is correct and not at all in dispute. EGID even admits that it never argued the voluntary payment rule on summary judgment. Consistent with that admission, the district court never mentions the voluntary payment rule in its memorandum granting summary judgment. The only mention of payment in that decision was the court's statement that "[p]laintiffs did enter into the agreement cited above and did voluntarily bear the costs of the system improvement to benefit their parcel." However, that statement was in the context of the district court's holding that the parties reached an agreement pursuant to the statute where Bremer was responsible for constructing the improvements. Thus, while the district court mentioned the word "voluntarily," it made that reference in the context of I.C. § 43-330A and whether Bremer entered into an agreement voluntarily. The district court never relied on the voluntary payment rule.

The district court also correctly denied Bremer's motion to reconsider because Bremer presented nothing new that created a genuine issue of material fact. Also, nowhere does the district court rely on the voluntary payment rule in denying Bremer's motion. At the March 14, 2012 hearing, the district court noted it was "paraphrasing" itself. This shows the court was not considering any new law, which the court also specifically stated. The court then noted that the record seemed "clear that plaintiffs responded with here's our plan for extending the main line, and that plan was accepted, that plan was finalized." The only place Bremer could possibly believe the district court implicated the voluntary payment rule was when it held there were no issues of material fact "because the action was acceded to by the plaintiffs." But in context, it is obvious the district court did not raise the voluntary payment rule.

Because the district court made its decision based on the same facts and law as on summary judgment, we affirm the district court's denial of the motion to reconsider. We do not need to consider the voluntary payment rule, so we do not consider whether Bremer's agreement was coerced. Further, because Bremer and EGID reached an agreement and there are no alternate grounds to deny summary judgment, we affirm the district court's grant of summary judgment.

**B. The district court correctly denied Bremer's Motion to Alter or Amend.**

12

On April 27, 2012, the district court denied Bremer's Motion to Alter or Amend the Judgment. Bremer argues this was error because the district court raised the voluntary payment rule in the motion for reconsideration hearing, which was a surprise. Bremer contends that because this rule was not briefed or argued, Bremer did not submit evidence on the negotiations surrounding the main line extension and did not focus on the defense of coercion. We have held that the district court did not use the voluntary payment rule. Thus, there is no surprise and the district court properly denied the motion to alter or amend.

**C. Neither party is entitled to attorney fees on appeal.**

Bremer argues they are entitled to attorney's fees pursuant to I.C. § 12-117 because a material question of fact clearly existed. Idaho Code section 12-117 awards reasonable attorney fees to the prevailing party. Here, Bremer is not the prevailing party. Thus, we do not award Bremer attorney fees on appeal.

EGID requests attorney fees solely under I.C. § 12-121, which allows an award of reasonable attorney's fees to the prevailing party in a civil action. This Court awards reasonable attorney fees under I.C. § 12-121 only when we are "left with the abiding belief that the appeal was brought, pursued or defended frivolously, unreasonably or without foundation." *Telford Lands LLC v. Cain*, 154 Idaho 981, 993, 303 P.3d 1237, 1249 (2013). Conversely, we will not award fees "[i]f there is a legitimate, triable issue of fact or a legitimate issue of law . . . even though the losing party has asserted factual or legal claims that are frivolous, unreasonable, or without foundation." *Id.* EGID argues that Bremer's appeal was frivolous because Bremer irrationally argued they did not need water delivery after requesting water and complained EGID did not consider an alternate route that Bremer never proposed.

Here, Bremer did pursue several unreasonable arguments. First, Bremer argues the voluntary payment rule on appeal when it is plain the district court never raised that issue. In fact, the district court never mentioned the voluntary payment rule in its grant of summary judgment to EGID. Also, in the motion for reconsideration the district court specifically noted that it relied on its first opinion by stating: "I just want to paraphrase the court's initial decision." Neither of these instances genuinely raised the voluntary payment rule. Second, Bremer continues to argue that EGID could have accepted an alternate route that Bremer's engineer never proposed. There is no evidence that EGID ever knew that Bremer had an alternate option

to provide water, and therefore Bremer has no legitimate basis to argue that the completed water line extension did not provide "for the proper distribution of water."

However, in the midst of these unreasonable arguments Bremer has argued a legitimate issue of law in contending that nothing indicated that the parties complied with I.C. § 43-330A because the statute's requirements were not followed. Although I.C § 43-330D specifies that owners remain liable until a contract is properly recorded, this contract was oral and unrecorded, and thus did not follow the statute's requirements. The issue of these requirements and their impact on the validity or enforceability of a contact has not previously been addressed by this Court. Thus, we do not award attorney fees to EGID.

## IV. CONCLUSION

We affirm the district court in all regards, but do not award attorney fees on appeal to EGID. Costs to EGID.

Justices EISMANN, J. JONES, W. JONES and HORTON, **CONCUR.**